[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought by the plaintiff acting by Michael Del Negro (hereinafter "the plaintiff' or "Del Negro") against the defendants Remo and Assunta Santilli (hereinafter "the defendants" or "the Santillis"). References to the individuals will be for the plaintiff "Michael Del Negro" and for the defendants "Remo Santilli". It is an action for fraudulent misrepresentation on the part of the defendants made to the plaintiff to induce the plaintiff to purchase specified assets of a business including the goodwill known as Santilli's Market (hereinafter also "the Market") located at 392-396 New Britain Avenue, Hartford, Connecticut. As noted in the STIPULATION TO FACTS dated August 23, 2000 attached hereto, there was a purchase and sale agreement between the plaintiff and the defendants dated April 28, 1997 on which dated the plaintiff and the defendants entered into a lease agreement whereby Del Negro agreed to lease from the Santillis the premises at which the Market was located. Further facts by stipulation are set forth in the aforementioned STIPULATION TO FACTS.
 STANDARD OF REVIEW
CT Page 14062
The Court is well aware of the law in Connecticut which provides that fraud or fraudulent misrepresentation must be proven by a standard more exacting than that of a fair preponderance of evidence. The standard in this case is that the plaintiff must prove its case by clear and convincing evidence.
Further, in order to prove a case of fraudulent misrepresentation, the plaintiff must prove the following elements:
 1. A false representation was made as to a statement of fact;
 2. That the statement was untrue and was known by the defendants to be untrue;
3. It was made to induce the plaintiff to do something; and
 4. The plaintiff acted upon the false representation to his (its) detriment. Kavarco v. T.J.E., Inc., 2 Conn. App. 294 (1984).
This trial before this Court took two and half days and was heard by this Court on August 24, 2000, August 29, 2000 and September 13, 2000. At the request of the parties, the Court agreed to bifurcate this case and first decide after receipt of the trial transcripts whether or not the elements of fraud by clear and convincing evidence have been proven. In the event that they have, and only in that event, the trial will resume as to the assessment of damages, (relief), due to the plaintiff.
 FINDINGS
In applying the above standards, the Court has considered the totality of the evidence including the exhibits and the testimony of the witnesses. Much of the Court's decision is based upon the credibility of the witnesses. The Court's evaluation of their credibility is based upon their demeanor and attitude on the witness stand, the manner in which they responded to questions and the instances where their testimony conflicted with their own testimony and with other evidence, including exhibits, their recollection or lack of recollection of certain events and the interest of the witnesses or lack thereof in the outcome of the case. The Court found Michael Del Negro to be forthright, honest, candid and very credible. Looking through the Court's notes, the Court finds that during his testimony on August 29, 2000 the Court noted "honest, candid" as to Michael Del Negro. In sharp contrast the Court found a clear lack of credibility of Remo Santilli who was not always truthful CT Page 14063 and who often told or committed what Winston Churchill has called "terminological inexactitudes". The Court found Remo Santilli to be evasive, contradictory, arrogant and on several occasions just not believable. Specific examples will follow.
The Court finds that Remo Santilli prior to the signing of the Purchase and Sale Agreement told Michael Del Negro that his weekly volume of sales was between $24,000 and $27,000. However, Remo and Assunta Santilli's 1996 income tax return, Schedule C, shows total sales of $1,005,106.00. Dividing that by fifty-two weeks equals average weekly sales of $19,328.96. The 1996 tax return is Plaintiffs Exhibit 20. Plaintiffs Exhibit 19, Remo and Assunta Santilli's 1995 tax return shows average weekly sales of $19,298.52. This is much below the amount represented to Michael Del Negro by Remo Santilli. As a matter of fact, Daniel Brock (hereinafter "Brock"), Vice President for Sales for Buzzotto's Inc., a wholesale food distributor that supplied the subject market on New Britain Avenue, testified that if the weekly sales were approximately $19,000, the store was not going to break even and was going to lose money. Based upon the income tax returns cited, Santilli's Market was losing money. Santilli told Del Negro that he would let him see the income tax returns but never did and added at that time in reference to the income tax returns, "I don't work for Uncle Sam." The clear inference is that he cheated on his income tax returns. If he was cheating on his income tax returns, his honesty certainly is in question, and there was no way of verifying what he told Del Negro; i.e. that the average weekly sales were between $24,000 and $27,000. Del Negro, therefore, relied upon Santilli's representation and he trusted him. A look at the 1997 income tax return for Remo and Assunta Santilli, Defendants' Exhibit D, shows gross sales of $398,992.00. Divided by the seventeen weeks from January 1, 1997 to April 28, 1997, the date of the closing of the sale, works out to average weekly sales of $23,470.12. This is still below the $24,000.00 represented to Del Negro by Santilli, but more importantly, the income tax return for 1997 was filled out and filed on October 15, 1998 long after the sale took place on April 28, 1997 and after the bringing of the subject lawsuit on May 26, 1998. In view of the unreliability of Santilli's testimony and his lack of credibility, a reasonable inference is that sales for the first seventeen weeks of 1997 were inflated on the income tax return. Additionally, B rock testified that the months of January through April were the slowest time of the year as to sales. Therefore, it is inconceivable that the weekly sales would have suddenly increased from the $19,000.00 figure to the $23,470.00 figure during the slowest period of the year. Further, Defendants' Exhibit A shows that purchases by Santilli from Bozzutto's, Inc. had gone steadily down the first four months of 1997. Defendants' claimed that they purchased from vendors other than Bozzutto's, Inc. during that period of time, but defendants showed no credible evidence of that and based upon Remo CT Page 14064 Santilli's lack of credibility, the Court believes that the decline in purchases from Bozzutto's, Inc. is further evidence that the weekly sales of $23,470.12 is an inflated figure.
The Court also heard testimony from Robert Davis, a public accountant, who as shown by Defendants' Exhibit C, a letter from him to Attorney Perrotta dated November 11, 1997, Mr. Davis was asked among other things to perform a year-end accounting for the Hartford store for the six months ended June 30, 1997. As noted in Exhibit C, he stated that the sales documentation was incomplete according to Remo and Assunta Santilli. Some sales receipts/cash register receipts had been saved during the move to Willington and some had not. Further, some of the register tapes that were saved were no longer legible. He states in the letter in pertinent part:
"Accordingly, rather than attempt to reconstruct the sales records,which I do not believe was a possible alternative anyway based on thecondition of the records, we were asked to take a "down and dirty"approach to accounting for sales." (emphasis added). Mr. Davis testified that no sales journal existed and that he had to rely on many of Remo Santilli's representations as to sales. The only documents with which he could deal were the monthly bank statements and attempt to back out all transactions that could not be identified as sales. It was clear from Mr. Davis' testimony and documents that the figure of $398,992.45 was unreliable. This is the figure that was used in the 1997 income tax return of the Santillis, and based upon the lack of records and the reliance on Remo Santilli's statements, the Court concludes that the figure of $398,992.45 is not an accurate figure, that the sales were closer to $323,000.00 for that period which would result in weekly average sales of approximately $19,000.00. The $398,992.45 is reflected in an attachment to Defendants' Exhibit C, the letter of November 11, 1997 from Mr. Davis.
Brock was asked by Michael Del Negro to provide a pro forma for the store at a weekly sales figure of $27,000.00 and to determine whether these sales figures were reasonable. Brock admitted that he was a good friend of Remo Santilli and had even seen him socially over at least a thirteen-year period. The pro forma, Plaintiffs Exhibit 1, shows a weekly average for the first year of $27,000.00 going up to $27,810.00 the second year. This is on page 2 of the Exhibit. On page 7 he lists the weekly break-even volume of sales at $24,219.84 for the first year. On page 125 of the trial transcript (hereinafter "TT") of August 29, 2000 Brock admitted that Remo Santilli had told him that the weekly sales averaged $24,000.00 to $27,000.00. He further testified that the representation of $24,000.00 to $27,000.00 was crucial to the integrity of the pro forma. TT 137, lines 20-24. On page 135 of the TT he said that CT Page 14065 the pro forma could not rely on the purchases from Bozzutto's alone. He did state, however, that aside from the representations by Remo Santilli, he used a formula to estimate the sales. This is based upon the purchases from Bozzutto's, Inc. over a fifty-two week period. Brock testified (TT 8/29/00, pages 132-3) that his pro forma based upon his formula was done from September, 1995 through September, 1996 which is Bozzutto's fiscal year. "His average purchases were $44,000.00 for a four week period. That four week period equals $11,000.00 weekly. $11,000.00 divided by our purchase concentration percent, which is forty percent, the average weekly sales come out to $27,000.00." However, he admitted on page 144 that the forty percent is simply a professional estimate on knowing the customer. Further, it is clear to this Court based upon observing the witness' testimony and knowing his friendship with Remo Santilli that Mr. Brock made every effort when he could to testify favorably towards Remo Santilli. It was only through cross-examination that he stated that he could not rely on Bozzutto's purchases alone, that it was an estimate and that he did rely on what Santilli told him as to the sales being between $24,000.00 and $27,000.00. The Court finds, therefore, that the pro forma, Plaintiffs Exh. 1, on which Del Negro relied was not accurate as to the sales. Mr. Brock also testified that he felt that the plaintiff was competent to run the market and that he had sufficient experience to do so. An issue was raised as to whether Remo Santilli's charm and personality resulted in higher sales than those sales obtained by the plaintiff once he took over the store. The evidence shows that while he owned the store, Remo Santilli was there only on Wednesdays and Sundays (the store then open a half day). He was at the store on those same days for the first thirty days per agreement in which Michael Del Negro operated the store. Nonetheless, the sales dropped substantially. The first week of sales for Del Negro was only $14,900.00 which reasonably surprised him because the first week of the month is generally a good week for sales because the food stamps and the welfare checks become available to the customers in that area at that time. Del Negro's average weekly sales for the first month were between $13,000.00 and $14,000.00 while Remo Santilli was there exhibiting his personality and charm no doubt in the same manner that he did prior to the sale. Because nothing changed as to his personality and charm during this thirty day period, the Court concludes that his personality and charm were not a factor in keeping the sales up because even with his personality and charm, the sales dropped.
The Court also finds that the defendants never gave accurate information to the buyer of the sales and did not provide the buyer with the income tax returns of Remo and Assunta Santilli as Remo Santilli had promised to do. Remo Santilli has testified that Del Negro never asked him for any of this. However, in the purchase and sale agreement, Plaintiffs Exh. 2, paragraph 4f states "The Sellers have not failed to disclose to CT Page 14066 the Purchaser any information that a reasonable Purchaser would regard as material in connection with the decision to enter into this Agreement." The Santillis clearly violated this provision of the Agreement. "The intentional withholding of information for the purpose of inducing action has been regarded, however, as equivalent to a fraudulent misrepresentation." Pacelli Bros. Transportation, Inc. v. Pacelli,189 Conn. 401, 407 (1983).
There were other statements by Remo Santilli which brings into question his credibility. When Del Negro was asked whether Remo Santilli ever told him why he wanted to sell the store, Del Negro stated "In so many words, he told me that he made one mistake in his life, and he cheated on his wife. And his wife is going to leave him and take his boys. Money was more important to him — I'm sorry. Family was more important to him than money . . . And he couldn't be with his wife unless he sold the store in Hartford." The Court finds this hard to believe as being true on the part of Santilli. Counsel for the defendants did admit during oral argument on an objection or in some other discussion that the defendants did not dispute that Remo Santilli made this statement to Del Negro and that Del Negro trusted Santilli. See page 42, TT 8/24/00. Santilli also made other representations which could, perhaps, be called puffery in the process of selling, and although they don't go to the heart of the matter, they do affect Remo Santilli's credibility. Del Negro testified that "He told me that whether I bought his store or not we would be friends forever. As a matter of fact, there came a point in time that he said "you and I are going to open stores together. Shake my hand on it.' I said yeah, fine Remo. He says "No, no, no shake my hand, shake my hand, we are going to open stores together.' I — shook his hand . . . Remo invited me and my wife to his home on at least two separate occasions. He told me that we were a lot alike, our backgrounds . . . we talked about — I talked about my dad, he talked about his mom." Further, Del Negro testified (TT 8/24/00, pp. 168-169): "Remo, I see some of the things you do with your customers where, you know — if you're — you know, can I — if you're flicking them Remo, how do I know you're not flicking me? And he says — he put his hand over his heart, and he says to me, he says, "you and I are like brothers, how could you say something like that to me? I would never do anything like that to you. You and I, — we're the same. We, you know, we're so much alike. You know, you got — you've got your family, I got my family. We're so much alike.' . . . He made me feel guilty that I asked him."
There are other misrepresentations by Remo Santilli. He said to Del Negro that he didn't want the lottery machine fixed. He thought it was broken. However, Daniel Rivellini, Collection Manager for the Connecticut Lottery testified that defendants' license was suspended and the terminal CT Page 14067 closed on February 25, 1997 at 2:20 p.m. There was no evidence the machine was broken. It wasn't until June 18, 1998 that Remo Santilli paid the outstanding bill of $8,841.67. It is also clear, despite Remo Santilli's denials, that there was no evidence that the machine was broken and that he had been informed by letter either mailed or dropped off to the store by the Lottery Commission, that he was delinquent $7,000.00 to $8,000.00 in what he owed the Lottery. Santilli testified that he sent two wire transfers for these amounts each of which came back because of insufficient funds which he dismissed as a mistake. However, he didn't pay this off until June 18, 1998. He also stated that when these notices came he was busy and Del Negro was there all the time which took his attention away from what was being delivered. However, Santilli later stated that in February 1997 when the letters were delivered Del Negro was not present those days. As a result of bills still being outstanding, Del Negro was prevented from having a lottery machine operating unless he were to pay the outstanding bill owed by Remo Santilli. The Court does not believe that Remo Santilli wanted to get rid of the lottery machine because customers had to wait in line to buy from it as he testified. The real reason he stopped the lottery was because the State terminated the terminal for nonpayment of the debt.
He also made light of taxes he owed to the City of Hartford telling Del Negro that they were minimal. However, in fact they amounted to approximately $130,000.00, and the property was about to be subject to a foreclosure sale by the City of Hartford before Remo Santilli eventually paid the taxes. Although the taxes on the real estate may not have directly affected the plaintiff, he faced the possibility of losing his lease. However, the Court views this as merely another example of the untruthfulness of Remo Santilli.
The Court does not believe Remo Santilli's statement that the store never lost money because if he was bringing in $19,000 or less in weekly sales, this, according to Brock was below the break-even point.
 CONCLUSION
Based upon the above and the totality of the evidence, the Court finds by clear and convincing evidence that the defendant, Remo Santilli, made a false representation as to the average weekly sales which is a statement of fact that was untrue and it was known by Remo Santilli to be untrue, that he made it to induce the plaintiff to purchase the grocery store at 392-3 94 New Britain Avenue, Hartford, Connecticut, that the plaintiff acted upon the false representation and relied upon it to his detriment in that he would not have purchased the store if he had known the true condition of its sales, the true condition of the lottery machine, and as a result of his purchase, he purchased assets of a CT Page 14068 business and its goodwill which business was actually losing money and continued to lose even more money once the plaintiff began to manage the store, all because of the fraudulent misrepresentations made by the defendant, Santilli. The Court concludes that Remo Santilli wanted to get rid of a store that was not making money and made the fraudulent misrepresentations to Del Negro in order to induce him to purchase said store, its assets and goodwill.
It is also clear Assunta Santilli was part of these fraudulent misrepresentations as aforesaid because she was acquiescing in the representations made by Remo Santilli, she was part-owner of the business and signed the Purchase and Sale Agreement, Plaintiffs Exhibit 2, which the Court has concluded was violated and at most times Remo Santilli was acting as her agent whom she had empowered to act on her behalf.
For all of the foregoing reasons, judgment is entered for the plaintiff against the defendants for fraudulent misrepresentation all findings aforementioned having being proven by clear and convincing evidence.
Rittenband, JTR
 DOCKET NO. CV-98-0580221 S : SUPERIOR COURT :
DEL NEGRO'S MARKET, LLC : JUDICIAL DISTRICT OF : HARTFORD :
VS. : AT HARTFORD :
REMO SANTILLI and : ASSUNTA SANTILLI : AUGUST 23, 2000
 STIPULATION TO FACTS
The Plaintiff, DelNegro's Market, LLC ("DelNegro") and the Defendants, Remo Santilli and Assunta Santilli ("Santilli") (collectively, the "Parties") do, hereby agree and stipulate as follows:
1. On April 28, 1997, the Parties entered into a Purchase and Sale Agreement concerning the purchase by Del Negro from Santilli of certain specified assets of a business known as Santilli's Market located at 392-396 New Britain Avenue, Hartford, Connecticut.
2. On April 28, 1997, the Parties entered into a Lease Agreement whereby DelNegro agreed to lease from Santilli 392-396 New Britain Avenue, Hartford, Connecticut. CT Page 14069
3. Pursuant to the Purchase and Sale Agreement, DelNegro paid Santilli the sum of $95,000.00 for the assets specified in the purchase and sale agreement, plus an additional $64,544.87 for the inventory, for a total purchase price of $159,544.87.
4. As of April 28, 1997, Santilli owed the City of Hartford the sum of no less than $128,000.00 for real estate taxes due and owing on 392-396 New Britain Avenue, Hartford, Connecticut.
5. As of April 28, 1997, the Connecticut Lottery Commission claimed that Santilli owed $9,006.51 to the Connecticut Lottery Corporation for unpaid Lottery sales, interest and penalties.
6. The outstanding real estate taxes as of April 28, 1997 due the City of Hartford were paid in full subsequent to April 28, 1997 by Defendants.
7. All amounts due to the Lottery Conumission were paid in full by Defendants subsequent to September 10, 1997.
PLAINTIFF,, DEL NEGRO'S MARKET, DEFENDANTS, REMO SANTILLI AND LLC, ASSUNTA SANTILLI,
By ____________________ By ____________________ Edward C. Taiman, Jr. Dale M. Clayton, Esq. Sabia Hartley, LLC Polivy Taschner, 190 Trumbull Street, Suite 202 P.O. Box 230294 Hartford, CT 06103 Hartford, CT 06103-0294 (860) 541-2077 (860) 560-1180 Juris No. 412905 Juris No. 407964 Its Attorneys Their Attorneys